# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **KELSI R. WASSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:24-cv-00450-ALT** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Frank Bisignano,*[1] | ) | |
| *Commissioner of SSA,* | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

On August 19, 2024, Plaintiff Kelsi R. Wasson was awarded disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act") beginning December 15, 2022, by Defendant Commissioner of Social Security ("Commissioner') due to a combination of impairments, including changes in her cervical spine. (ECF 11 Administrative Record ("AR") 740-55). Wasson now appeals to the district court the portion of the Commissioner's decision denying her disability for the period of March 1, 2020, to December 15, 2022. (ECF 1). For the following reasons, the Commissioner's decision will be affirmed.

## I. FACTUAL AND PROCEDURAL HISTORY

Wasson applied for DIB and SSI in June 2020, alleging disability as of March 1, 2020. (AR 274-75, 740).[2] Wasson's claims were denied initially and upon reconsideration. (AR 99-100,

---

[1] Frank Bisignano became the Commissioner of Social Security in May 2025, and thus, pursuant to Federal Rule of Civil Procedure 25(d), he is automatically substituted for his predecessor as the defendant in this suit. *See La'Toya R. v. Bisignano,* No. 1:24-cv-01564-JMS-TAB, 2025 WL 1413807, at *n.2 (S.D. Ind. May 15, 2025).

[2] The AR page numbers cited herein correspond to the ECF-generated page numbers displayed at the top center of the screen when the AR is open in ECF, rather than the page numbers printed in the lower right corner of each page.

131-32). An administrative law judge ("ALJ") denied Wasson's applications in July 2022 after an administrative hearing. (AR 20-42, 69-98). After the Appeals Council denied review (AR 8-11), Wasson appealed to federal court the ALJ's decision denying disability (AR 859-60). *See Wasson v. Comm'r of Soc. Sec.*, No. 1:23-cv-00048-SLC (N.D. Ind. filed Feb. 2, 2023). On September 14, 2023, pursuant to an agreed motion to remand by the parties, the Court reversed the ALJ's decision and remanded the case to the Commissioner. (AR 866).

On remand, another administrative hearing was held in June 2024, at which Wasson, who was represented by counsel, a medical expert, and a vocational expert ("VE") testified. (AR 766-829). On August 19, 2024, the ALJ rendered a partially favorable decision to Wasson, concluding that she was disabled beginning December 15, 2022, but not disabled from March 1, 2020, to December 15, 2022, because she could perform a significant number of unskilled jobs at all exertional levels despite the limitations caused by her impairments. (AR 740-55). The Appeals Council declined to assume jurisdiction, and the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

On October 23, 2024, Wasson filed a complaint in this Court appealing the Commissioner's final decision as to the period of March 1, 2020, to December 15, 2022. (ECF 1). Wasson advances two arguments in this appeal: (1) that the ALJ erred in evaluating and articulating the persuasiveness of the medical opinion evidence pertaining to her mental health; and (2) that the ALJ failed to properly formulate a mental RFC supported by substantial evidence. (ECF 15 at 13).[3]

On August 19, 2024, the date of the Commissioner's final decision, Wasson was forty-one years old (AR 269), had a high school education (ECF 324), and had past relevant work as a

---

[3] Because Wasson does not challenge the ALJ's consideration of her physical impairments and the assigned physical RFC, the Court will not discuss the evidence pertaining to Wasson's physical impairments.

nurse assistant, home attendant, and general machine operator. (AR 93; *see also* AR 324). In her application, Wasson alleged that she was disabled due to "bipolar depression" and anxiety. (AR 323).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the Commissioner applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (collecting cases). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## III. ANALYSIS

### *A. The Law*

Under the Act, a claimant seeking DIB or SSI must establish that she is "unable to engage

3

in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also id.* §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring the ALJ to consider sequentially whether:

> (1) the claimant is presently employed [in substantial gainful activity]; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's [RFC] leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Pufahl v. Bisignano*, 142 F.4th 446, 452-53 (7th Cir. 2025) (citation omitted); *see also Sevec v. Kijakazi*, 59 F.4th 293, 298 (7th Cir. 2023); 20 C.F.R. §§ 404.1520, 416.920. "Between the third and fourth steps, the ALJ determines the claimant's [RFC], which is the claimant' maximum work capability." *Pufahl*, 142 F.4th at 453 (citations omitted); *see also* 20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). "The burden of proof is on the claimant for the first four steps." *Fetting v. Kijakazi*, 62 F.4th 332, 336 (7th Cir. 2023) (citation omitted). "At step five, the burden shifts to the [Commissioner] to show that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations." *Id.* (citation and internal quotation marks omitted). "If at any step a finding of disability or nondisability can be made, the Social Security Administration will not review the claim further." *Sevec*, 59 F.4th at 298 (citation and brackets omitted).

*B. The Commissioner's Final Decision*

In the Commissioner's final decision, the ALJ found as a threshold matter that Wasson was insured for DIB through June 30, 2026. (AR 743). At step one of the five-step sequential analysis, the ALJ found that Wasson had worked at the substantial gainful activity level in 2020, working 36 hours per week at Parkview Regional Medical Center. (*Id.*). The ALJ further found that while Wasson worked after 2020 as well, her earnings after 2020 were below the substantial gainful activity threshold. (*Id.*). At step two, the ALJ found that Wasson had the following severe impairments since her alleged onset date of disability, March 1, 2020, to December 15, 2022: major depressive disorder with anxious distress, adjustment disorder with mixed anxiety and depressed mood, unspecified anxiety disorder/generalized anxiety disorder, bipolar II disorder, depressed with anxiety distress, post-traumatic stress disorder (PTSD), and a binge eating disorder. (AR 743). The ALJ further found that beginning on December 15, 2022, Wasson had the following additional severe impairments: degenerative disc disease of the cervical and lumbar spine with radiculitis/stenosis with herniated disc and cord compression of the cervical spine, myalgia, torticollis, migraines/occipital neuralgia, and chronic pain syndrome. (*Id.*).

At step three, the ALJ concluded that Wasson did not have an impairment or combination of impairments severe enough to meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 745). The ALJ assigned Wasson the following RFC:

> [P]rior to December 15, 2022, the date the claimant became disabled, the claimant had the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant could understand, remember, and carry out simple short instructions (preferably in writing) related to repetitious and well-practiced tasks, and she could make judgments related to simple work-related decisions. The claimant could respond appropriately to occasional interactions with coworkers and supervisors, with a predictable group of individuals, she could tolerate superficial interactions with the general public; and she should have avoided work activity in retail sales. The claimant could respond appropriately to usual work situations, and she could deal with routine changes in a routine work setting free from fast paced production requirements, such as assembly line type

work activity, and with few, if any, changes in terms of work setting, tools, and processes.

(AR 746). The ALJ further opined:

> [S]ince December 15, 2022, the claimant has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except as limited by the following. The claimant can understand, remember, and carry out simple short instructions (preferably in writing) related to repetitious and well-practiced tasks, and she can make judgments related to simple work-related decisions. The claimant can respond appropriately to occasional interactions with coworkers and supervisors, with a predictable group of individuals, and she can tolerate superficial interactions with the general public; she should avoid work activity in retail sales. The claimant can respond appropriately to usual work situations, and she can deal with routine changes in a routine work setting free from fast paced production requirements, such as assembly line type work activity, and with few, if any, changes in terms of work setting, tools, and processes. The claimant can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. The claimant should avoid all exposure to fumes, odors, dusts, gases, and poor ventilation. She can occasionally handle and finger with the bilateral upper extremities, and she should avoid work activity requiring a forceful grip or grasp, such as turning knobs or levers. She should avoid all exposure to wet, slippery, or uneven surfaces, unguarded moving machinery, and unprotected heights. She can never reach overhead with the bilateral upper extremities.

(AR 750).

The ALJ determined at step four that given the assigned RFC, Wasson could not perform any of her past relevant work. (AR 752). However, at step five the ALJ found that for the period of March 1, 2020, to December 15, 2022, a hypothetical individual of Wasson's age, education, experience, and assigned RFC could perform a significant number of unskilled jobs at all exertional levels in the national economy, including automotive detailer, hand packager, and cleaner. (ECF 753). The ALJ further found that beginning on December 15, 2022, a hypothetical individual of Wasson's age, education, experience, and assigned RFC could only perform one job, call out operator, for which there were approximately 8,000 jobs in the national economy, which is not a significant number of jobs. (AR 754). Accordingly, Wasson's applications for DIB

and SSI were denied for the period of March 1, 2020, to December 15, 2022, but granted for the period beginning December 15, 2022. (AR 754-55).

*C. The Medical Opinion Evidence*

Wasson argues that that the ALJ erred in evaluating and articulating the persuasiveness of the medical opinion evidence pertaining to Wasson's mental health. (ECF 15 at 14). Specifically, she challenges the ALJ's consideration of the opinions of her treating psychiatric nurse practitioners, Janet Anderson, NP, and Teresa Roberts, NP;[4] the reviewing state agency psychologist, Leslie Predina, Ph.D.; and the medical expert who testified at the June 2024 administrative hearing, Kevin M. Schumacher, Ph.D. (*Id.* at 15). After setting forth the relevant law, the Court will address each of these medical opinions in turn.

1. Relevant Law

In assessing medical opinion evidence, an ALJ is to consider the factors set forth in 20 C.F.R. §§ 404.1520c(c) and 416.920c(c) when determining the proper weight to apply to the opinion. These factors are: 1) supportability; 2) consistency; 3) relationship with the claimant, including the length, purpose, and extent of the treatment relationship, the frequency of examinations, and the examining relationship; 4) specialization; and 5) other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1520c(c), 416.920c(c); *see, e.g.*, *Etherington v. Saul*, No. 1:19-CV-475-JVB-JPK, 2021 WL 414556, at *3 (N.D. Ind. Jan. 21, 2021). "Although the ALJ must consider all of these factors, [she] need only explain how [she] considered supportability and consistency." *Kaehr v. Saul*, No. 3:19-CV-1171-PPS, 2021 WL 321450, at *3 (N.D. Ind. Feb. 1, 2021) (citations omitted) ("[T]he factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how

---

[4] These two nurse practitioners will be referred to herein as "NP Anderson" and "NP Roberts".

persuasive we find a medical source's medical opinions or prior administrative medical findings to be." (alterations in original) (quoting 20 C.F.R. §§ 404.1529c(b)(2), 416.920c(a))).

    2. <u>NP Anderson</u>

    NP Anderson completed a medical source statement questionnaire on August 17, 2021, reporting that Wasson had symptoms of apathy, anhedonia, fatigue, depression, anxiety, and insomnia; had little to no control over her moods; and had felt "consistently depressed" since 2007. (AR 657-61). NP Anderson identified "signs" on mental status exams as "alert [and] oriented, limited insight, and apathetic." (AR 658). In response to whether Wasson could return to full-time work, NP Anderson circled "Don't Know" and wrote: "She feels she could possibly work part time. Feels anxiety would worsen with full time work." (AR 659). NP Anderson estimated that Wasson would miss more than three days a month if she were to work full-time, that she would have difficulty maintaining concentration and attention for unskilled work due to "[r]acing thoughts with anxiety[,]" and that she could stay on task less than seventy percent of a workday due to her symptoms. (AR 660).[5] NP Anderson further indicated that Wasson would have trouble getting along with others because she is "[a]rgumentative" and that she should work alone or in physical isolation from others. (AR 661). When asked whether Wasson complies with treatment, NP Anderson responded that Wasson "claims compliance with therapy[,]" but when depressed, she "procrastinates and skips meds." (*Id.*).

    The ALJ penned a lengthy paragraph about NP Anderson's questionnaire, thoroughly summarizing the finding therein. (AR 749). However, the ALJ found the opinion "not persuasive" for the following reasons:

---

[5] At the June 2024 administrative hearing, the VE testified that if a person consistently misses three days of work a month, or was off task fifteen percent or more in a workday, she would be unable to maintain competitive employment. (AR 816, 819).

> Ms. Anderson largely relies upon the claimant's subjective reports to support the limitations opined, and the mental status examination findings of being apathetic and having limited insight but alert and oriented do not support the extent of the limitations opined. (Ex. 7/2; see also Ex. 5F). The extent of limitations opined are also inconsistent with the opinions of the consultative examiner, Dr. Predina, and the State agency psychological consultants, who suggested moderate limitations.

(AR 749). Wasson challenges the ALJ's reasoning, asserting that the ALJ improperly discounted NP Anderson's opinion on the basis that it largely relied on Wasson's subjective report. (ECF 15 at 20). Wasson emphasizes that the Social Security rulings permit a medical source to opine about a claimant's symptoms and their effects. (*Id.* (citing SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017))). Wasson also accuses the ALJ of substituting her lay opinion for that of a treatment provider when stating that the mental findings of apathy, limited insight, and alert and oriented, do not support the limitations opined. (*Id.* (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

When assessing a medical opinion, 20 C.F.R. §§ 404.1520c(c) and 416.920c(c) require an ALJ to assess and explain how she considered the supportability and consistency factors. *See Kaehr*, 2021 WL 321450, at *3. Here, the ALJ sufficiently did so. "Mental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lense of her professional expertise." *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) (citing *Price v. Colvin*, 794 F.3d 836, 840 (7hh Cir. 2015)). NP Anderson opined she did not know whether Wasson could work full time, and that Wasson "*feels she could possibly work part-time.*" (AR 659 (emphasis added))*.* NP Anderson's language does not suggest that she assessed Wasson's complaints "through the objective lens of her professional expertise." *Mischler*, 766 F. App'x 375.

Further, it is the ALJ's duty to consider whether NP Anderson's opinion is adequately supported, and the ALJ reasonably made this assessment when observing that the clinical signs

9

of "alert [and] oriented, limited insight, [and] apathetic" on mental status examinations offered little support for the opined limitations. (AR 658). "The ALJ is tasked with assessing medical evidence to determine a claimant's RFC, and an ALJ does not 'play doctor' by performing this function." *Ma Gloria B. v. Bisignano*, No. 24-cv-50367, 2025 WL 2721086, at *6 (N.D. Ill. Sept. 24, 2025) (citations omitted). Notably, Wasson does not actually dispute the ALJ's observation that NP Anderson's opinion was inconsistent with the moderate limitations opined by Dr. Predina and the state agency psychologists, to be discussed *infra*.

In sum, Wasson's challenge to the ALJ's consideration of NP Anderson's opinion is without merit. The ALJ fairly assessed NP Anderson's opinion, including the factors of supportability and consistency, in accordance with 20 C.F.R. §§ 404.1520c(c) and 416.920c(c), and her conclusion is supported by substantial evidence.

### 3. NP Roberts

NP Roberts completed a functional capacity assessment questionnaire on July 25, 2024. (AR 2688-91). She indicated that Wasson was "unable to meet competitive standards" in maintaining attention for two-hour segments, maintaining regular attendance, completing a normal workweek, performing at a consistent pace, responding appropriately to changes in the workplace, dealing with work stress, setting realistic goals and working independently of others, and interacting appropriately with the general public. (AR 2689). NP Roberts rated Wasson as "seriously limited" in remembering work-like procedures, understanding and remembering very short and simple instructions, working in proximity to others without distraction, accepting instruction from supervisors, understanding and remembering detailed instructions, carrying out detailed instructions, and maintaining socially appropriate behavior. (*Id.*). NP Roberts estimated that Wasson would miss more than four days of work per month if working full-time. (AR 2690).

The ALJ penned a full paragraph about NP Roberts's July 2024 questionnaire, summarizing the findings in the questionnaire. (AR 752). But the ALJ found the opinion "not persuasive" because NP Roberts did "not provide support for her opinion nor are the extent of limitations opined consistent with the claimant's history of conservative mental health treatment or the medical opinions of multiple other consulting medical experts as described previously." (AR 752). Wasson argues the ALJ improperly addressed NP Roberts's questionnaire, asserting that the ALJ failed to "minimally articulate *how* one assessment is better supported than the other." (ECF 15 at 21 (citation omitted)).

Wasson's cursory criticism of the ALJ's reasoning is ineffective. The ALJ adequately addressed the supportability and consistency factors as required by 20 C.F.R. §§ 404.1520c(c) and 416.920c(c) when assessing NP Roberts's questionnaire ⎯ a point that Wasson does not dispute. As the ALJ observed, NP Roberts offered no supporting clinical signs in the questionnaire, and the severe limitations she described are inapposite to the moderate limitations opined by Dr. Predina and the state agency psychologists, to be discussed *infra*. The ALJ's consideration of NP Roberts's opinion is adequately supported and articulated.

    4. Dr. Predina

Dr. Predina saw Wasson on December 1, 2020, for a mental status exam at the request of the state agency. (AR 407-10). Wasson's dress and grooming were clean and appropriate, and her speech articulation was normal. (AR 408). Her affect was labile, and her mood suggested feelings of latent anger, depression, and anxiety. (*Id.*). Her performance on the mental status exam indicated cognitive functioning in the low average range, and her understanding of arithmetic appeared limited. (AR 410). Her judgment, common sense, orientation, memory, and ability to sustain concentration and persistence appeared impaired. (*Id.*). Dr. Predina opined that Wasson may have some problems recalling tasks on a job and being able to concentrate and

persist in her job responsibilities. (*Id.*). Yet, Dr. Predina indicated that Wasson appeared to have the cognitive ability to perform comparable jobs that she had performed in the past. (*Id.*). Dr. Predina opined that Wasson's symptoms were consistent with persistent depressive disorder, PTSD, generalized anxiety disorder, and alcohol use disorder, but not the diagnostic criteria of a bipolar disorder. (*Id.*). Dr. Predina indicated that Wasson would likely struggle to get along with supervisors and coworkers, but that she may benefit from counseling if she chose to pursue it. (*Id.*).

The ALJ wrote a paragraph on Dr. Predina's opinion, summarizing the findings therein. (AR 748). The ALJ concluded that the opinion was "not entirely persuasive" for the following reasons:

> Dr. Predina only very broadly identifies the claimant's functional limitations, and the opinion appears somewhat internally inconsistent in that it identifies limitations in the claimant's level of cognition as well as in her ability to concentrate and persist on job duties but concludes that she could perform jobs like those of her prior (semi-skilled) work. Nevertheless, Dr. Predina's clinical findings, including the ability to perform some mental arithmetic and digit span recall, support some moderate cognitive limitations as noted.

(*Id.*).

Wasson argues that the ALJ's use of the phraseology "broadly identifies" says nothing about the supportability or consistency of Dr. Predina's opinion. (ECF 15 at 16). Perhaps. But the ALJ's comment observed, and correctly so, that Dr. Predina did not specify the degree to which Wasson was limited in certain mental abilities, such as maintaining concentration, persistence, or pace. (*See* AR 410 ("Her ability to sustain concentration and persistence appeared to be impaired. She may have some problems being able to concentrate and persist on her job responsibilities.")). In any event, the ALJ *did* address the supportability and consistency factors in the rest of her explanation. She viewed Dr. Predina's opinion as "somewhat internally inconsistent" because it identified limitations in cognition and the ability to concentrate and

persist in job duties, but at the same time concluded that Wasson could perform work akin to her prior semi-skilled jobs. (AR 748). The ALJ also addressed the supportability of the opinion in noting that Dr. Predina's clinical findings supported some moderate cognitive limitations, given the results of the cognitive testing administered by Dr. Predina. (*Id.*). Thus, contrary to Wasson's assertion, the ALJ satisfied her statutory duty under 20 C.F.R. §§ 404.1520c(c) and 416.920c(c) to discuss the supportability and consistency factors.

Wasson also faults the ALJ for failing to adopt Dr. Predina's opinion that Wasson's ability to concentrate and persist on tasks was impaired, given that the ALJ found Dr. Predina's opinion partially persuasive. (ECF 15 at 16-17). Wasson claims that "[t]he ALJ's assigned RFC included no restriction to account for Wasson's deficits in concentrating and persisting." (*Id.* at 17). But as already explained, the ALJ discounted Dr. Predina's opinion, in part, because it did not offer any degree of limitation in certain abilities, such as maintaining concentration, persistence, or pace. In assigning the mental RFC, the ALJ relied to a greater extent on the findings of two state agency psychologists, Ken Lovko, Ph.D., and J. Gange, Ph.D., who reviewed Wasson's record, including Dr. Predina's opinion, in December 2020 and March 2021, respectively. (*See* AR 103, 108-12, 134-38, 748-49). Dr. Lovko, after finding that Wasson had "moderate" deficits in maintaining concentration, persistence, or pace (AR 106), concluded that Wasson was not disabled, stating:

> ADLs: Claimant is able to manage own grooming/hygiene, can make simple meals, can do household ADLs such as cleaning, laundry, can drive independently, can shop, can manage own finances. Claimant enjoys watching TV. Claimant can go out unaccompanied. Claimant reports socially isolating self. Better with verbal than written instructions. Claimant reports no difficulty with authority figures. Claimant reports difficulty managing stress and changes.

> After careful consideration of the evidence, the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical

evidence in the record. Claimant is on psychotropic meds. Not currently receiving psychiatric treatment or psychotherapy services. There have been no psychiatric hospitalizations. [Claimant] repeatedly quits, but is not fired from, jobs.

To the extent the claimant is physically capable, the totality of evidence in file suggests that the claimant is able to: understand, carry out and remember simple instructions; able to make judgments commensurate with functions of simple, repetitive tasks; able to respond appropriately to brief supervision and interactions with coworkers and work situations; able to deal with routine changes in a work setting.

(AR 112). Dr. Gange issued a similar opinion three months later, affirming the mental limitations opined by Dr. Lovko. (AR 138).

In considering Dr. Lovko's and Dr. Gange's opinions, the ALJ found them "generally persuasive[,]" explaining: "[T]he consultants are familiar with the disability program, and their opinions are supported by a summary of the available evidence, including the claimant's history of conservative mental health treatment and reported activities of daily living, and it considers the report and opinion of Dr. Predina, who examined the claimant." (AR 748). The ALJ further noted that to the extent Dr. Lovko's and Dr. Gange's opinions were not entirely consistent with the opinion of Dr. Schumacher, who testified as a medical expert at the June 2024 administrative hearing and offered several more restrictive mental limitations, the ALJ included the more restrictive mental limitations⎪ superficial interaction with the general public, avoiding retail sales work, and avoiding fast-paced production work⎪ in the RFC. (AR 748-49).

Given the lack of specificity in Dr. Predina's' opinion concerning the degree of limitations in maintaining concentration, persistence, or pace, the ALJ's reliance on Dr. Lovko's and Dr. Gange's more specific medical source statements is reasonable. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are "highly qualified and experts in Social Security disability evaluation." *Anders v. Saul*, No. 20-3429, 2021 WL 2396236, at *4 (7th Cir. June 11, 2021) (citing 20 C.F.R. §

404.1513a(b)(1)). "It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation." *Flener ex. rel Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citation omitted); *see* 20 C.F.R. §§ 404.1520c(c)(5), 416.920c(c)(5) (including as "other factors" to consider when weighing medical source opinions "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the Social Security Administration's] disability program's policies and evidentiary requirements").

5. Dr. Schumacher

Wasson also contends that the ALJ erred when considering the opinion of Dr. Schumacher, who testified as a medical expert at the June 2024 administrative hearing. (ECF 15 at 17-19). Wasson argues that the ALJ failed to reconcile Dr. Schumacher's testimony that Wasson's "attendance at work might be a problem" (AR 781), with NP Anderson's opinion that Wasson would miss more than three days of work a month (AR 660). (ECF 15 at 18).

A review of Dr. Schumacher's testimony, in relevant part and taken in context, is helpful. Early in the hearing the ALJ asked Dr. Schumacher to describe Wasson's abilities and limitations, to which Dr. Schumacher responded:

> I think she should be able to tolerate tasks that are found to be repetitious and well practiced, such as in her past work. . . . . [W]ell-practiced tasks should be managed adequately. And she should be able to deal with short and simple instructions. I think she should be able to maintain attention and concentration for two to two and a half hours before a break. I think a treating source has indicated that attendance at work might be a problem, but I don't think that has really been tested since the alleged onset date. She . . . had a few jobs. She should be able to maintain an ordinary routine without supervision . . . .

(AR 781). Wasson's counsel then questioned Dr. Schumacher as follows:

> Q     You mentioned in your description of the [RFC] that you reviewed notes from Ms. Wasson's treating provider and opinion that she would be absent from work three or more days a month, correct?

15

A        Yes.

Q        Okay. Your statement before disagreeing with that opinion was that you don't feel it was a tested opinion. Is that correct?

A        Yes.

Q        Would your answer change if you knew she had at least six employers in the last two years?

A        I mean, that sort of depends on why she separated from them.

Q        Well, . . . does the fact that she had so many employers in just the last 24 months indicate anything to you?

A        I have considered many possibilities. I have to base my opinion on the medical records, and we don't have that information.

Q        Okay. Would it be reasonable to assume it is related to her mental health given your review of her mental health records? . . . [I]s it your opinion that Ms. Wasson's treating providers are in a better position to opine about her mental health given their treating relationship with Ms. Wasson?

A        Yes.

Q        Throughout the mental health records did you find that Ms. Wasson was crying easily in examinations . . . ?

A        Yes.

Q        Would that impact her ability to perform work activity with interactions with others even if they were superficial?

. . . .

A        Well, I do see notes in the record what she describes as crying. Yes. To me that is not unusual. People cry all the time in my office. It depends on how that translates into a job site.

Q        Her mood is reported fluctuating and sometimes described as [labile] . . . . What impact would that have on her ability to perform competitive work?

A        Well, . . . it depends on the level of control around people. People have suffering moods, especially if they have a mood disorder. It depends on the effectiveness of the proper therapy and the level of control. I don't see that includes the decompensation, the current hospitalization. Those kind of things would suggest a mood disturbance. Those types of evidence are not here.

16

. . . .

Q        Would you agree that failure to take prescribed medications is indicative of a period of decompensation?

A        No. There are other reasons why people don't take their meds.

. . . .

Q        . . . . Ms. Wasson has been consistently a no-call, a no-show and she consistently loses jobs and that is evidence[d] throughout the record. Did you take that into consideration?

A        Is that directly attributable to the depression?

Q        It is in her psychiatric treatment notes.

A        Well, yeah. I suppose. If somebody is saying that they were too depressed to attend to employment, then that is a pretty clear attribution. . . .

. . . .

Q        Her treating provider opines that she would miss greater than three days a work due to mental illness. Do you have any reason to disagree with that . . . .

. . . .

A        No. I haven't had any reason to disagree with that.

. . . .

Q        And so, your orientation to the sleep disorder and to the opinion . . . by nurse practitioner Anderson doesn't change your moderate rating of concentration, persistence and pace.

A        No. Many people have difficulty sleeping and still go to work.

Q        Right. Presumably, they don't have all of the impairments in combination though. You would agree?

A        Many people have depression and anxiety and they still go to work.

(AR 783-804).

17

Later in the hearing the ALJ summarized Dr. Schumacher's testimony, and the ALJ's summary was consistent with the assigned RFC. (AR 807-08). The ALJ then asked Dr. Schumacher to confirm whether it accurately captured his opinion. (AR 08). Dr. Schumacher confirmed that it did and recommended no changes. (*Id.*). At that point Wasson's attorney objected, asserting that the ALJ's summary of Dr. Schumacher's opinion was "inconsistent with . . . his actual testimony" because it failed to account for Wasson's expected absenteeism. (AR 809). The ALJ then ALJ re-questioned with Dr. Schumacher as follows:

> Q      . . . [G]iven . . . your evaluation of the medical evidence and discussions today . . . , in your ultimate opinion . . . you did not include any likely absences from the workplace. Was that an omission, was that intentional omission –
>
> A      No.
>
> . . . .
>
> A      Well, just to be clear on my position, I don't have a basis for renumerating the number of absences she might have from her job. I certainly would agree that nurse practitioner Ander[s]on says that because it is a matter of record. I am not sure I understand the rationale for choosing that number of days versus another number of days. I don't think it would be possible on the basis of the depth of her symptoms how many days she would be absent from work.
>
> ALJ:    All right. Anything else, counsel . . . ?
>
> Q      But you agree, and your testimony was, doctor, that attendance at work may be a problem, correct?
>
> A      Yes.

(AR 810-11).

Ultimately, the ALJ found Dr. Schumacher's opinion "persuasive[,]" explaining her reasoning as follows:

> Dr. Schumacher supported his opinion with multiple references to the medical record, and his opinion regarding overall moderate limitations is consistent with the opinion of consultative examiner Dr. Predina as well as the opinions of the State agency psychological consultants. The claimant's representative questioned Dr. Schumacher at length regarding his decision not to adopt the limitation that the

claimant would be absent from work three or more days per month, as opined by Ms. Anderson, and noted that the claimant had had several employers within the last two years. In response, Dr. Schumacher noted that the reasons these jobs ended is unclear and that, therefore, such events could not be used to support a limitation regarding absences.

(AR 749).

Wasson, citing Dr. Schumacher's testimony regarding absenteeism, faults the ALJ for not incorporating any absenteeism limitations in the RFC, contending that the ALJ "failed to confront an entire line of evidence that was consistent with the opinion that Wasson would be absent from work three or more times per month due to her mental health symptoms . . . ." (ECF 15 at 19). The Court does not agree. As set forth in the excerpt quoted above, the ALJ confronted the evidence of absenteeism and explained why she found Dr. Schumacher's testimony persuasive and assigned the RFC that she did. (*See* AR 749). In his testimony, Dr. Schumacher acknowledged NP Anderson's estimated rate of absenteeism, but he certainly did not endorse it as his own. To the contrary, Dr. Schumacher stated that he did not have a basis to predict the number of absences Wasson might have from a job. (*See* AR 810).

Furthermore, as already explained, the ALJ found the opinions of NP Anderson and NP Roberts unpersuasive, including their estimates of expected absenteeism, and the Court has concluded that the ALJ's consideration of NP Anderson's and NP Roberts's opinions is adequately articulated and supported by substantial evidence. Likewise, as to Wasson's testimony that she was terminated from many of her jobs due to her depression (AR 812), the ALJ found Wasson's symptom testimony was "not fully supported[,]" viewing the claimed severity of her symptoms as inconsistent with "receiv[ing] only conservative mental health treatment and show[ing] improvement with a combination of psychotropic medications and therapy." (AR 747). For example, as the ALJ noted, Wasson was fired from her job at Parkview Regional Medical Center in May 2021 due to looking at a family member's chart, not because of her

19

mental impairments. (AR 743; *see* AR 76, 84, 354; *see also* AR 450 ("Changed jobs and not getting as many hours as she had hoped. Missing out on some jobs due to her poor work history. Works for a few months then moves on.")).

In sum, Wasson's argument that the ALJ erred in evaluating and articulating the persuasiveness of the medical opinion evidence pertaining to her mental health for the period of March 1, 2020, to December 15, 2022, is unavailing. The ALJ adequately assessed the medical opinion evidence under the factors set forth in 20 C.F.R. §§ 404.1520c and 416.920c and built a logical bridge from the evidence to her conclusion. *See Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." (citation omitted)). The ALJ then confronted and resolved the conflicts between the medical source opinions of record. *See Clifford*, 227 F.3d at 869 ("The Court do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner's." (citations omitted)); *Bailey v. Barnhart*, 473 F. Supp. 2d 842, 849 (N.D. Ill. 2006) ("[W]hen the record contains conflicting medical evidence, the ALJ has an affirmative responsibility to resolve that conflict." (citing *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). The Court will not accept Wasson's plea to reweigh the medical source opinion evidence at this juncture. The ALJ's consideration of the medical source opinions is supported by substantial evidence.

### D. The Mental RFC

Wasson also challenges the mental RFC assigned by the ALJ for the period of March 1, 2020, to December 15, 2022. (ECF 15 at 22). But in doing so Wasson just rehashes the arguments she raised to dispute the ALJ's consideration of the medical source opinions. (*See id.* at 22-25).

The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five days a week. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (bold emphasis omitted). The RFC assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence. *See* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). "[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citation omitted); *see also* 20 C.F.R. §§ 404.1545(e), 416.945(e).

As already explained, in crafting the mental RFC for the period of March 1, 2020, to December 15, 2022, the ALJ relied on the opinions of Dr. Lovko, Dr. Gange, and Dr. Schumacher, as well as the opinion of Dr. Predina in part. (*See* AR 748-49). In doing so, the ALJ concluded that Wasson had "moderate" limitations in maintaining concentration, persistence, or pace, and assigned a mental RFC limiting her, in relevant part, to "repetitious and well-practiced tasks" with "simple short instructions" and a work setting "free from fast paced production requirements . . . and with few, if any changes in . . . work setting, tools, and processes." (AR 746). Wasson has not produced a medical source opinion assigning her greater mental limitations in maintaining concentration, persistence, or pace. "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)).

Wasson next repeats her mantra that the RFC is deficient because it includes no restrictions for additional breaks or an impaired ability to maintain a regular work schedule. (ECF 15 at 23). To reiterate, for the reasons already explained, the ALJ credited the opinions of Dr. Lovko, Dr. Gange, and Dr. Schumacher in declining to include such a restriction, and these opinions provide substantial evidence to support the assigned RFC.

Lastly, Wasson argues that the "longitudinal record demonstrates that [her] mental impairment-related symptoms affect her ability to sustained work[,]" given that her "earnings records are replete with unsuccessful work attempts." (*Id.* at 24 (citations omitted)). In support, Wasson relies on her own testimony and statements that she could not keep a job due to her mental health symptoms and the opinions of NP Anderson and NP Roberts about her estimated rate of absenteeism (*id.*)—all evidence which the ALJ found either "not fully supported" (AR 747) or "unpersuasive" (AR 749, 752). The Court has already concluded that the ALJ's rationale in this respect is adequately supported and articulated.

Therefore, Wasson's challenge to the mental RFC assigned by the ALJ for the period of March 1, 2020, to December 15, 2022, is merely duplicative of her arguments disputing the ALJ's consideration of the medical source opinions. The Court will not rehash those arguments here. For the reasons already expressed, the mental RFC assigned by the ALJ is supported by substantial evidence, and the ALJ's decision will be affirmed.

### IV. CONCLUSION

The Commissioner's final decision denying disability is AFFIRMED. The Clerk is DIRECTED to enter a judgment in favor of the Commissioner and against Wasson.

SO ORDERED. Entered this 7th day of November 2025.

/s/ Andrew L. Teel
Andrew L. Teel
United States Magistrate Judge